UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
**OSBERT HAYNES,**

               **Plaintiff,**

   -against-                                     Civil Action No:

**LAIDLAW & COMPANY (UK) LTD.,**        **COMPLAINT**

               **Defendant.**
------------------------------------------------------------X

**PLAINTIFF OSBERT HAYNES**, by his attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, as and for his Complaint, states and alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This is a civil action brought on behalf of Plaintiff Osbert Haynes (hereinafter referred to as "Plaintiff") against Defendant Laidlaw & Company (UK) Ltd. (hereinafter referred to as "Defendant" or "Laidlaw"), for race discrimination and hostile work environment in violation of 42 U.S.C. § 1981, the New York State Human Rights Law (N.Y. Exec. Law §§ 290 et. seq.) ("SHRL") and the New York City Human Rights Law (N.Y.C. Code §§ 8-107, et. seq.) ("CHRL"), together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331.

3. This Court has jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1332 because Plaintiff is a resident and domiciliary of the State of New Jersey and

Defendant's principal place of business is located in the State of New York. Further, Plaintiff has been damaged in an amount to be determined at trial but in no case less than $75,000.00, exclusive of attorneys' fees, costs, and expenses.

4. Venue is proper pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events which give rise to the Plaintiff's claims took place in New York County, New York which is located in the Southern District of New York and (2) Defendant's principal place of business is located in New York County, New York which is in the Southern District of New York.

## THE PARTIES

5. Plaintiff is an African American male, who is a resident and domiciliary of Somerset County, New Jersey.

6. At all times relevant to this complaint, Plaintiff was an "employee" of Defendant as that term is defined by all relevant Federal, State and local laws.

7. Upon information and belief, Laidlaw, at all relevant times, was and is a registered broker-dealer firm specializing in investment banking and securities brokerage, with a principal place of business located at 521 Fifth Avenue, 12th Floor, New York, New York 10175.

8. At all times relevant to this complaint, Defendant was Plaintiff's "employer" as that term is defined by all relevant Federal, State and local laws.

## FACTUAL ALLEGATIONS

9. Plaintiff commenced employment at Laidlaw on or about September 17, 2013, as a stockbroker.

10. Initially, Plaintiff was excited by the opportunity to work for Defendant's brokerage firm, as Plaintiff believed his charisma, warm personality, prideful work ethic and

nearly two decades of experience selling securities would result in significant commissions and lucrative repeat business for both he and Defendant.

11. Additionally, Plaintiff was led to believe Defendant would provide the necessary support, resources, assigned accounts and mentorship from supervising executives, in order to maximize earnings for Plaintiff, and by extension Laidlaw.

12. Brokers, like Plaintiff, were generally paid via commission-based compensation, where brokers and Defendant received a percentage of the trading activity. As such, the brokers who received the necessary support, accommodations, and mentorship from Laidlaw supervisors, as well as business opportunities in the form of assigned accounts, proprietary information and clients who invested with Defendant, were put in better position to secure higher earnings.

13. Plaintiff worked hard for Defendant for over six years but, unfortunately for Plaintiff and his fellow minority colleagues, they were not operating on an even playing field at Laidlaw.

14. Over his period of employment, Plaintiff observed that his Caucasian counterparts, mainly Laidlaw's Caucasian brokers, routinely received far more of the aforementioned necessary support, resources, mentorship and business opportunities he sought when commencing his employment with Defendant.

15. Throughout Plaintiff's tenure, he became increasingly aware of the disparate treatment he and his African American colleagues experienced; the racial bias became more apparent to Plaintiff as the discriminatory behavior worsened in severity and the Caucasian members of the executive staff became less discreet in their despicable uttering of racial epithets and general hate speak.

16. Initially, Plaintiff noticed he, and the other African American brokers, were treated far worse than his similarly situated non-African American broker colleagues.

17. Defendant afforded Plaintiff's white counterparts better professional opportunities and equipment to fulfill their job duties. By way of example, without limitation:

(i) the Caucasian brokers were routinely mentored more often by the white executives, with more thorough advice, provided more favorable contracts, given more viable assigned accounts for new or repeat business and/or introductions to higher net-worth customers of Defendant;

(ii) When a broker left Laidlaw, the lucrative, best accounts and customers, who remained with the firm, were routinely assigned to Caucasian brokers;

(iii) African American brokers, like Plaintiff, were not invited to certain client entertainment events, or team morale building activities like Laidlaw trips to Jets games, whereas Plaintiff's similarly situated white broker-colleagues were routinely invited to same;

(iv) African American brokers were offered less favorable contracts than similarly situated white counterparts, and also received less compensation, as well as smaller bonuses, lump sum payments and raises, with less frequency than their non-African American counterparts;

(v) Certain black brokers were provided worse offices, lower quality office furniture such as desks and chairs (and in some instances, were even told to sit on the floor);

(vi) Some African American brokers were not provided computers or company phones while their white counterparts were provided all of these resources utilized to sell stocks from day one;

  (vii) Certain black brokers were not able to process their own trades, and forced to have assistants process trades, while the Caucasian brokers always had the ability to process their own trades;

  (viii) White brokers were permitted to pitch ideas to executives, including to Laidlaw's Chief Executive Officer Matthew Eitner ("Eitner"), but black brokers, like Plaintiff, were often patronized and told to focus on their assigned work—as if not capable of developing strategy or generating new business on their own.

18. Upward mobility at Laidlaw was also seemingly only available to Caucasian employees with the firm leadership, executives, senior management and supervisors, all being Caucasian males.

19. Plaintiff grew increasingly aware of the aforementioned advantages enjoyed by the Caucasian brokers. Eventually, it became apparent to him and most, if not all, of the African American employees that the preferential treatment of the Caucasian employees was not based on any difference in performance but was rather spurred on by Defendant's highest leaderships bias and racist views against the African American employees.

20. With each passing year, Defendant's animus towards African American employees, including Plaintiff, became more and more apparent to Plaintiff, and Plaintiff's work environment rapidly deteriorated to a point where he was exposed and subjected to increasingly more frequent derogatory slurs and racially motivated attacks.

21. The more time Plaintiff spent around Laidlaw, the more he heard derogatory, racist bile spewed among the executives, supervisors and certain brokers, all of whom were Caucasian.

22. By way of example, but not limitation, Plaintiff personally heard Caucasian agents of Laidlaw unapologetically use racial slurs to describe African Americans,

including, but not limited to: "nigger", "coon", "angry black guy", "Buckwheat", "Aunt Jemima", "tan guy", "Mahogany", "the brown man".[1]

23. While there was no shortage of bad actors, from executives to supervisors to fellow brokers, who Plaintiff heard uttering racial slurs, one of the worst offenders of spewing ignorant racist venom was Plaintiff's direct supervisor: Todd Cirella, Laidlaw's Senior Managing Director ("Cirella"), who was also the Head of Recruiting when Plaintiff was employed by Laidlaw.

24. Early in his tenure working for Defendant, Plaintiff learned the white stockbrokers hired by Cirella were receiving large initial lump sum sign-on bonuses, significantly larger than those that Plaintiff and the other African American brokers received upon being hired (which in some cases was $0).

25. Additionally, Plaintiff learned certain Caucasian brokers who, like Plaintiff, were working under their original employment contract, received additional lump sum payments as a bonus for renegotiating or resigning their contracts.

26. Plaintiff asked Cirella, several times, for comparable treatment to his Caucasian counterparts and sought a new, renegotiated contract and lump sum bonus akin to those received by Caucasian brokers with production and experience similar to Plaintiff's.

27. Cirella would occasionally patronize Plaintiff, and halfheartedly claim he wanted Plaintiff to succeed, but he never once accommodated Plaintiff or gave him a lump sum bonus, raise or renegotiated contract like the ones Caucasian brokers routinely received.

28. Plaintiff constantly felt like he had to beg simply to receive equal treatment from Laidlaw, but never received same.

---

[1] While Plaintiff, and his African American colleagues, received the Lion's share of the racist rhetoric, other minority employees were also forced to listen to hateful bigotry on display by certain Laidlaw agents, employees and supervisors, like the following racial slurs, without limitation: "sand nigger"; "A-Rab"; "smelly Indian", "smelly brown guy".  One employee was harassed for bringing in his/her lunch from home as the food "smelled Puerto Rican".

29. Aside from never receiving anything approaching the bonuses, raises, equipment, accommodations and professional opportunities provided without question to similarly performing Caucasian brokers, Plaintiff was often excluded from client entertainment activities or team bonding events, like the home Jets games Laidlaw executives would attend with Caucasian employees.

30. When brokers voluntarily resigned or were terminated, Defendant would often keep the customers and reassign them among the brokers.

31. The higher net worth customers, and/or easier, lower maintenance clients would routinely be assigned to Caucasian brokers as opposed to Plaintiff or his African American colleagues.

32. This pattern continued with Plaintiff and his direct supervisor, Cirella, who reserved the "good" customers for the Caucasian brokers, only.

33. As time marched on, Ciirella's bigotry became more and more evident.

34. Cirella clearly could not control his mouth as the racial slurs poured out of him consistently during Plaintiff's employment.

35. On multiple times, Cirella referred to an African American colleague of Plaintiff's as "Buckwheat," and he also heard his supervisor and fellow Senior Managing Director Jay Russo ("Russo"), Cirella's good friend, exchange countless racist jokes and racial slurs demeaning black people.

36. On occasion, Cirella and/or Russo would catch themselves being racist in front of Plaintiff and attempt to salvage the situation, playing it off as a good-humored joke, and insist that Plaintiff, "Call me honky!"

37. The poor cover-up, which occurred multiple times, would not comfort Plaintiff nor make him feel better about the constant stream of inappropriate hate-speak from his direct supervisor, and other executives.

38. The racist rhetoric was especially painful for Plaintiff to listen to, particularly when he became increasingly cognizant of the aforementioned competitive advantages enjoyed by his Caucasian colleagues, and the accommodations, higher quality equipment and significant business opportunities which gave Plaintiff's Caucasian counterparts an objectively easier road to success and riches.

39. Although the blatantly racist comments were launched by a number of Laidlaw agents, Cirella's behavior proved particularly hateful and egregious.

40. Upon information and belief, Cirella has worked for Laidlaw for in excess of 15 years and continues to hold a senior position at Laidlaw.

41. During Plaintiff's employment with Laidlaw, Cirella subjected African American stockbrokers to severe and abhorrent treatment including, but not limited to, frequent racist attacks and, incredibly, threats of physical harm.

42. Plaintiff was present for the overwhelming majority of his direct supervisor Cirella's racist bullying on display in the following, non-exhaustive list in which he harassed, bullied and terrorized Plaintiff's colleague(s), including African American brokers:

(i) Cirella often referred to African American broker as "my #1 coon," "brown guy," the "angry black guy," and, upon information and belief, he was the first person to use the nickname "Buckwheat" when referring to African American broker at Laidlaw. Notably, Cirella's use of the nickname "Buckwheat" when referring to African American broker led a number of other senior Laidlaw employees to follow suit.

(ii) Cirella freely used the despicable racial slurs, "nigger" and "sand-nigger," both orally, and in electronic communications referencing minority employees with other Laidlaw agents.

      (iii)    Cirella sent racist electronic messages with, and to, other Laidlaw executives, supervisors and employees. Such messages included, but were not limited to, a text message in which Cirella stated, of African American broker, "*Let's fire this nigger and take his book*," *along with a disturbing image of a noose and an individual hanging from said noose*. Cirella sent other images of nooses, and a number of other racial epithets, when referring to both African American broker and other Laidlaw employees in subsequent electronic messages. Plaintiff observed these disturbing images at work.

      (iv)    Cirella, while intoxicated at a company golf outing, attempted to physically attack African American broker when African American broker suggested he should not urinate on the golf course. At such time, while being restrained from attacking African American broker, in front of numerous witnesses Cirella repeatedly called African American broker "nigger" and "coon".

      (v)    Over the following year, Cirella told African American broker, "I'm going to get you kicked out of the business and *you will be working in the hood*;" continued to call African American broker "Buckwheat" repeatedly at work and events, including a company party; and told African American broker it was "niggerish to bring home a doggy bag," from a restaurant. There were numerous Laidlaw employees and managers who observed this behavior.

43.    Plaintiff was present for all of the above instances of despicable racism by Cirella, causing him to live in fear of his direct supervisor, for approximately four years from 2015 to July 29, 2019, at a minimum, when his employment ended with Laidlaw.

44. Upon information and belief, CEO Eitner, and fellow executive James Ahern, the Head of Capital Markets ("Ahern"), were made aware of Cirella's despicable racist behavior and hateful text message communications as early as December 2015.

45. Indeed, African American broker complained of Cirella's, and others', racist behavior to multiple supervisors during Plaintiff's time at Laidlaw.

46. Moreover, CEO Eitner was advised of Cirella's racist text messages, and other racist behaviors, at a meeting with another Laidlaw supervisor in December 2015.

47. In response, Eitner did nothing to meaningfully investigate, address, or remedy the discriminatory treatment permeating Laidlaw's toxic work environment or the racist behavior of Laidlaw's supervisory personnel or toxic culture at Laidlaw.

48. Indeed, Cirella still works for Laidlaw in his executive, supervisory position to this day.  Upon information and belief, there was never a break in Cirella's employment.

49. In an effort to escape from the undeniably caustic work environment at Laidlaw, Plaintiff was forced to formally resign on July 29, 2019.

## DEFENDANT LAIDLAW'S LIABILITY

50. Defendant Laidlaw is liable for its employees' deprivation of Plaintiff's rights because such acts were taken in accordance with the Defendant Laidlaw's custom or practice of discriminating and/or selectively treating individuals and retaliating against individuals for lawful complaints of discrimination and/or harassment.

51. Defendant Laidlaw's custom and practices of discrimination were so persistent and widespread that they constituted the constructive acquiescence of highest reaching members of the executive staff; and the individual executives directly participated in and/or tacitly condoned the discrimination to which Plaintiff was subjected.

52. As Senior Managing Director and Head of Recruiting, Cirella exercised complete control over Plaintiff and used his position of power to create a hostile work

environment and actively condoned the exacerbation of such environment against Plaintiff, and other African American employees, on the basis of Plaintiff's race

53. As CEO of Laidlaw, Eitner exercised complete control over the firm operations and maintenance and was responsible and the final decision maker regarding all employee decisions, hirings, promotions, funding, and firm activities.

54. Eitner was fully aware of the breadth of Cirella's racism and discriminatory behavior towards Plaintiff's, and Laidlaw's African American employees, in general.

55. Such racist, discriminatory behavior, described herein, was par for the course for Cirella, who has a noted and public history of discriminating against black and other minority personnel at the broker dealer firm, such that Cirella's behavior has been the impetus for multiple lawsuits and/or FINRA investigations, hearing, against Defendant by current and/or former employees at Laidlaw.

56. Despite knowledge of Cirella's behavior and multiple repeated complaints of discrimination and retaliation against Cirella, Defendant has permitted Cirella to continue as Senior Managing Director without reprisal for his actions, thereby tacitly condoning the discrimination, harassment, and retaliation experienced by Plaintiff and other minority employees.

57. As a result of the racial discrimination, harassment, abuse and disparate treatment experienced by Plaintiff in the hostile work environment that was and is Laidlaw, Plaintiff suffered from immense sadness, anxiety, diminution of self-worth, mental anguish, fear of failure, lost confidence, fear of loss of employment as well as loss of past and future income, loss of potential clients and loss of future economic opportunity related to same.

## **CLAIMS FOR RELIEF**

## **AS AND FOR THE FIRST CAUSE OF ACTION**
*(Race Discrimination in violation of 42 U.S.C. § 1981, the SHRL and the CHRL)*

58. Plaintiff repeats and re-alleges each and every allegation as set forth in paragraphs "1" through "57" above with the same force and effect as if fully set forth herein.

59. Plaintiff is an African American male and is, therefore, a member of a protected class under all relevant Federal, State, and local laws.

60. Plaintiff was and is qualified to work as an employee for Defendant and he satisfactorily performed the duties required by all positions he held with Defendant.

61. As set forth in detail herein and above, Defendant subjected Plaintiff to disparate treatment and an atmosphere of adverse employment actions and decisions because of his race.

62. As set forth in detail herein and above, Defendant subjected Plaintiff to a hostile work environment on the basis of his race.

63. The race discrimination that Plaintiff suffered while employed with Defendant severely affected the terms and conditions of his employment, as set forth in detail here and above.

64. By reason of Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment and he was forced to resign to avoid further pain, damages and violations.

65. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered emotional distress.

66. Based on the foregoing, Defendant discriminated against Plaintiff on the basis of his race in violation of the SHRL, the CHRL, and 42 U.S.C. § 1981.

67. As a result of Defendant's violations of the aforementioned Federal, State, and local laws, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Hostile Work Environment in violation of 42 U.S.C. § 1981, the SHRL and the CHRL)*

68. Plaintiff repeats and re-alleges each and every allegation as set forth in paragraphs "1" through "67" above with the same force and effect as if fully set forth herein.

69. Plaintiff is an African American male and is, therefore, a member of a protected class under all relevant Federal, State, and local laws.

70. Plaintiff was and is qualified to work as an employee for Defendant and he satisfactorily performed the duties required by all positions he held with Defendant.

71. As set forth in detail herein and above, Defendant subjected Plaintiff to disparate treatment and an atmosphere of adverse employment actions and decisions because of his race.

72. As set forth in detail herein and above, Defendant subjected Plaintiff to a hostile work environment on the basis of his race in that the racial slurs, derogatory comments and imagery within communications, disparate treatment and unwillingness to invest resources, equipment and opportunities to support Plaintiff, were severe, pervasive and wholly unreasonable under the circumstances.

73. The race discrimination that Plaintiff suffered while employed with Defendant severely affected the terms and conditions of his employment, as set forth in detail here and above.

74. By reason of the hostile education environment created by Defendant, including the aforementioned misdeeds of Cirella, and acquiescence of same by Eitner, as well as Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary

and other benefits associated with his employment and he was forced to resign to avoid further pain, damages and violations.

75. As a direct and proximate result of said hostile work environment and unlawful employment practices, Plaintiff has suffered emotional distress.

76. Based on the foregoing, Defendant discriminated against Plaintiff on the basis of his race and subjected him to a hostile work environment in violation of the SHRL, the CHRL, and 42 U.S.C. § 1981.

77. As a result of the hostile work environment and Defendant's violations of the aforementioned Federal, State, and local laws, Plaintiff has been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i) On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case, no less than $500,000.00, exclusive of reasonable attorneys' fees and costs;

(ii) On the Second Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case, no less than $500,000.00, exclusive of reasonable attorneys' fees and costs;

(iii) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
July 29, 2022

        **NESENOFF & MILTENBERG, LLP**
        *Attorneys for Plaintiff*

By:   /s/ Nicholas E. Lewis
       Andrew T. Miltenberg, Esq.
       Nicholas E. Lewis, Esq.
       Gabrielle M. Vinci, Esq.
       363 Seventh Avenue, Fifth Floor
       New York, New York 10001